JAMES SHAW, as Trustee, etc., Respondent, *v.* SARANAC HORSE NAIL
    COMPANY, Defendant; HARRIET H. VILAS and Others, as Admin-
    istrators, etc., Appellants.

78    7
144a 220

*Payment by a stockholder of the bonds of the corporation — not a purchase of an
    equity in surplus money resulting on a mortgage foreclosure sale — hypothecation
    of bonds, not a payment of the debt for which they are pledged — a person divert-
    ing bonds cannot acquire a good title thereto.*

An agreement was made between two of the stockholders of an insolvent cor-
    poration, organized under chapter 611 of the Laws of 1875, which recognized the
    insolvency of the company and the liability of the stockholders for its debts, and
    whereby the parties thereto agreed to pay the debts of the company (included
    in which were certain mortgage bonds), such parties taking assignments of all
    evidences of such debts for the purpose of enforcing contribution from the other
    stockholders. It was also agreed that a mortgage given by such corporation
    should be foreclosed and the proceeds of the sale had thereunder, together with
    all moneys realized from the personal property of such corporation, should be
    applied to the satisfaction of the debts.

*Held,* that, in executing the arrangement, it was impracticable for such persons to
    turn their payments of obligations (in which were included certain bonds secured
    by the mortgage) into a purchase of an equity in the proceeds of the funds,
    realized by the sale under foreclosure of the mortgage which was given to
    secure the corporate mortgage bonds, as against holders of other similar bonds,
    who had purchased the same for value.

The hypothecation of bonds to secure the payment of the debts of a corporation
    does not pay the debts, but it does subject the bonds to the risk of their transfer
    at a price less than par, as a sale upon pledge would be to the highest bidder
    without regard to the limit of any resolution of the company prescribing the
    selling price.

A person cannot acquire a good title to bonds, which were originally diverted
    from their purpose by being pledged by him to an innocent holder, by there-
    after taking upon himself the obligation for which such bonds were improp-
    erly pledged.

APPEAL by the defendants, Harriet H. Vilas and others, as admin-
istrators, etc., of Samuel F. Vilas, deceased, from an order of the
Supreme Court, made at the St. Lawrence Special Term and entered
in the office of the clerk of the county of Clinton on the 19th day
of January, 1893, modifying the report of a referee.

*G. W. Beckwith,* for the appellants.

*T. F. Conway,* for the respondent.

PER CURIAM:

We have carefully examined the evidence in this appeal, the report of the referee, the opinion of the learned judge at Special Term, and the order made by the Special Term, and think the order should be affirmed on the opinion of the judge at Special Term.

Present — MAYHAM, P. J., PUTNAM and HERRICK, JJ.

Judgment affirmed, with costs.

The opinion of the judge at Special Term referred to, was as follows:

RUSSELL, J. :

The point to be decided arises out of the claim of different bond-holders to the money arising upon the foreclosure of the mortgage upon which this action was brought. The method by which these proceeds were realized was practically a plan for marshaling of the remaining assets of the company for distribution to the proper persons. The administrators of S. F. Vilas, deceased, claim to hold the bonds secured by the mortgage, amounting with interest to the sum of $23,558.23. Mrs. Foote and others, opponents of the Vilas claim, concededly hold bonds secured by the mortgage, amounting with interest to $8,496.25. The proceeds of sale amount to $12,030.58, and the question to be decided is whether that sum shall be paid *pro rata* to all of the persons claiming to be bondholders, after deducting the trustee's costs of a previous litigation and his commissions.

The Saranac Horse Nail Company was a corporation organized under the Full Liability Act (Chap. 611, Laws of 1875), by which it is provided that all the stockholders shall be severally individually liable to the creditors of the company for all debts and liabilities, and may be joined as defendants in any action against the company, but no execution shall be issued against a stockholder individually until after execution against the company has been returned unsatisfied. (§ 34.) Section 25 also provides that no stockholder shall be liable personally for debts not to be paid within two years from the time they are contracted.

S. F. Vilas, deceased, and Andrew Williams, through whom the administrators of Vilas claim, were stockholders in the Saranac

Horse Nail Company, Williams being its president. The other bondholders were not stockholders in that company.

The bonds were authorized in the year 1883 upon a resolution of the company as follows: " That the president and secretary are hereby authorized to execute a mortgage on the property of the company to George W. Watson, as trustee, to secure the sum of thirty thousand dollars, in coupon bonds of the company, to be issued by them for the purpose of raising money to pay the floating debts of the company, etc. \* \* \* That the Hon. Andrew Williams be authorized to negotiate the $30,000 bonds this day authorized to be issued, at a price not less than par and accrued interest."

The first of the bonds to mature was not payable until the year 1886, *so that the stockholders were not liable upon the debt created by the issuing of these bonds*, but were liable upon other outstanding obligations of the company, consisting of notes owing the two banks of which Vilas and Williams were presidents and the Keeseville Bank.

Mr. Williams sold of these bonds at once $6,500 to Mrs. Foote and the other claimants, and later to Mrs. Town $2,000, which last-mentioned bonds Mr. Vilas obtained from Mrs. Town; later still Williams sold $1,000 worth to William Farrell, which he afterwards took from Farrell and subsequently transferred to the administrators of Vilas upon the arrangement hereinafter referred to. Williams afterward sold to Stephen Moffitt $1,000 of the bonds, which he also transferred to the administrators of Vilas upon the arrangement referred to, and a year later Williams sold Mrs. Ellis $3,000 worth, which the administrators of Vilas took from Mrs. Ellis upon the said arrangement.

The remaining bonds, instead of being sold by Williams, were pledged by him to various banks, including two banks of which Williams and Vilas were presidents, as security for past due or maturing notes of the company.

About the 18th of May, 1886, it having been discovered that the Saranac Company was insolvent, an agreement was made between Williams and the Vilas administrators which recognized the insolvency of the company, the liability of the stockholders and agreed to pay the debts of the company, one-third by Williams and the

other two-thirds by Vilas' administrators, the parties taking assignments of all evidences of debt for the purpose of contribution from the other stockholders. And it was also agreed that a mortgage should be foreclosed and the proceeds, with all moneys realized from the personal property, applied to the satisfaction of the debts.

It will thus be seen that this agreement provided that the remaining property of the company should be applied to the payment of the debts of the company, and that those debts which were paid by Williams and Vilas' administrators were to be held only for the purpose of contribution, so that impliedly Williams and Vilas' administrators did not intend to hold the evidences of debts collected by them for any other purpose than that of contribution from the other stockholders. The provision that if Williams and Vilas' administrators purchased the property, it was to be held by them in the proportion of one-third to Williams and two-thirds to the estate of Vilas, does not conflict with this presumption, for the agreement itself presupposes the entire debts of the company were to be paid, so that there would be no other claimants to that property except the two parties immediately interested.

But that agreement was not carried out in full. About $10,000 of the debts of the company, including the bonds to Mrs. Foote and others, were not paid owing to the insolvency of Williams and his inability to complete the agreement.

Under these circumstances who has the superior equity to the proceeds realized from the foreclosure of the mortgage given to secure the bonds? Mrs. Foote and the other claimants who paid money on a direct and plain purchase, were confessedly holders for value whose obligations would have been paid had the agreement between Williams and the administrators of Vilas been carried into effect.

This is the case also with the other bonds sold by Williams and not pledged to the banks had they remained in the hands of the original holders. With the exception, however, of the bonds of Mrs. Town purchased by Vilas in his lifetime, the remaining bonds came into the hands of Vilas' administrators in carrying out the arrangements by which those bonds were to be retired, except as they might be held for the purpose of contribution by the other stockholders.

A few of the bonds were paid by Williams, as he expresses it in his testimony, before the arrangement of May, 1886, because the holders wanted the money, and these bonds formed part of the number transferred to the Vilas administrators in execution of that arrangement of May, 1886.

I am inclined to believe that in executing the arrangement it was impracticable for the Vilas administrators to turn their payments of obligations into a purchase of an equity in the proceeds of funds realized by the foreclosure of the mortgage which was given to secure the bonds.

The interests received by the administrators of Vilas from the transfer by Williams to them to secure his obligation for the sum of $3,300 was also in pursuance of this arrangement, and at the time it appears to me it was *not intended* that these bonds should be held as live obligations coequal and coexisting with the bonds held by the outside parties.

Williams and Vilas' administrators upon entering into the agreement of May 18, 1886, contemplated the entire payment of the $90,000 of obligations of the company, and with that view had no thought or intention of holding any securities as against the bondholders who had purchased bonds in good faith for value. Assuming that the evidence justifies the conclusion that at that time Williams and Vilas' administrators held some bonds which had been issued to Mrs. Town and others for value, the agreement of May, 1886, spoke with reference to those bonds as well as the others and operated in its force upon them as a portion of those bonds taken up or to be taken up by the two contracting parties.

There is another reason why the bonds not sold outright by Williams are not valid obligations in the hands of the Vilas administrators. The resolutions under which Williams acted were plainly for the purpose of raising money to pay the debts of the company, and his power to sell was limited to a sale at not less than par. The power conferred is to be judged by the intent of the resolution. The limit upon the price and the provision that the bonds are for the purpose of paying the debts of the company leave no room for argument. Hypothecation of bonds in such a case does not advance one step towards the payment of debts of the company and does incur the risk of the purchase of them at a price far less than par,

for a sale upon pledge would be to the highest bidder without regard to the limit of the resolution, provided the original pledge was valid.

Of course it may be that, independently of any resolution empowering Williams to sell, the possession of apparently fully executed bonds by the president of a company would give the implied power to *bona fide* purchasers for value to take them irrespective of the limitations upon that apparent power. But the banks parted with nothing of value, nor does it appear from the evidence, so far as I can discover, that the pledging of the bonds was simultaneous with the extension of credit.

However that may be, Williams and Vilas were arranging the placing of the bonds of the company in such a manner as to wholly or partly free themselves from the obligations upon which they were personally liable, and it was their duty to see that those bonds were not diverted from the plain purpose for which they were issued. They cannot nor can either of them claim to be *bona fide* holders of bonds, which claim they could not successfully maintain had the bonds been issued directly to them, they having taken up the securities for which they were to be pledged; nor can they acquire a good title, because the bonds were originally diverted from their purpose into the hands of an innocent holder by their own action and thereafter taking upon themselves the obligation for which those bonds were improperly pledged.

I am satisfied from the evidence and all of the inferences to be drawn from the acts of all the parties, that Williams and Vilas were familiar with the disposition of the bonds, the purpose for which they were given, and that, therefore, they cannot as to those bonds by any series of circumstances stand as *bona fide* holders for value of that portion which was pledged for the payment of the antecedent debts on which Williams and Vilas were personally liable, even if the agreement of May, 1886, had not made them voluntarily obligated to pay the debts of the company.

These views upon the effect of the stockholders' liabilities, the agreement of May, 1886, and the effect of the resolution upon which the bonds were issued, lead to the subordination of the claims of the Vilas administrators to the proceeds as against Mrs. Foote and the other *bona fide* holders.

I see no reason why Mr. Vilas, although a stockholder of the company, could not lawfully purchase and hold the bonds of the company if the purchase was uncomplicated with other modifying circumstances.

The report will be modified by striking out the provisions for a *pro rata* disposition of the proceeds, and by inserting a direction that the bonds of Mrs. Foote, Miss Parker, Ryan and Mrs. Purdy be first paid out of the proceeds. Otherwise the report is confirmed.